Filed 4/11/22

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>    v.<br><br>CHARLIE HOLA,<br><br>      Defendant and Appellant. | C087459<br><br>(Super. Ct. No. 15F07862) |

APPEAL from a judgment of the Superior Court of Sacramento County, Maryanne G. Gilliard, Judge. Reversed in part and affirmed in part.

Charles M. Bonneau, Jr., Retained Counsel for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Julie A. Hokans, Supervising Deputy Attorney General, Robert Gezi, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I and III-VI of the Discussion and the Disposition are certified for publication.

This case involves another gang altercation that resulted in loss of life. A jury found defendant Charlie Hola guilty of second degree murder. It also found him guilty of multiple offenses relating to a crime spree that preceded the murder. Defendant was sentenced to an aggregate term of 48 years to life.

Defendant originally raised several contentions related to the natural and probable consequences theory underlying his second degree murder conviction, including that insufficient evidence supported his conviction based on that theory and he was entitled to relief under Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). He also asserted that his trial counsel rendered ineffective assistance in failing to object to speculative gang testimony; that insufficient evidence supported a finding that he acted for the benefit of a criminal gang; that there was instructional error related to the natural and probable consequences doctrine relative to self-defense and mutual combat; and that certain conduct credits the trial court withheld for jail misconduct must be restored.

After oral argument, we allowed defendant to file supplemental briefing on Senate Bill No. 775 (2021-2022 Reg. Sess.) (Senate Bill 775). Senate Bill 775 specifically allows a defendant convicted of murder based on the natural and probable consequences doctrine to "challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 [Citation]." (§ 1170.95, subd. (g).)[1] Both parties now agree that defendant's murder conviction can no longer stand in light of the Senate Bill 1437 and Senate Bill 775 amendments. The parties, however, disagree as to whether we must also remand the matter back to the trial court to afford the prosecution the opportunity to advance a valid murder theory at a new trial.

In the published portion of this opinion, we reverse defendant's murder conviction and vacate the associated enhancements. We hold that the People are entitled to retry

---

[1] Undesignated statutory references are to the Penal Code.

defendant on the murder charge based on a valid theory of liability if it can do so in good faith, along with the associated enhancements.

In the unpublished portion of this opinion, we reject defendant's other contentions or conclude that they are moot in light of the reversal of his second degree murder conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Crime Spree Before the Murder

Defendant's contentions arise from a murder capping a three-hour crime spree. The crime spree began when defendant and his codefendant, Tevita Kaihea,[2] stole a van and drove it to a fast food restaurant, where they robbed two people at gunpoint.[3]

About a half-hour later, they drove by the home of T.L. who, seeing the van, became suspicious that the van's occupants had been involved in a robbery the previous day where some of T.L.'s marijuana had been taken. T.L. got his gun and drove after the van. When it came to a stop, he started photographing the van. The codefendant stepped out of the passenger's side of the van and shot his gun six or seven times.[4] The first shot hit T.L. in the face. He survived, though a bullet remains in his head.

### The Gang Altercation and Murder

About an hour later, defendant and codefendant arrived at Sacramento City College where surveillance cameras would capture the murder. In the surveillance video, which was played for the jury, R.G. and R.R. can be seen walking down the street. Both were Norteño gang members.

---

[2] Kaihea, who was convicted of first degree murder and other charges, is not party to this appeal. (See *People v. Kaihea* (2021) 70 Cal.App.5th 257.)

[3] Only the codefendant displayed a gun during the robbery.

[4] Someone opened the passenger side door to T.L's truck, and after the shooting, the gun T.L. had was missing.

R.G. and R.R. crossed paths with defendant and the codefendant, before exchanging looks and squaring off. A witness who skateboarded by described the four as "arguing" or having a "disagreement." The skateboarder couldn't hear what was said as he had headphones on. But the skateboarder noticed defendant looked particularly angry, and R.G. looked "kind of confused"

R.G. then dropped his backpack as defendant charged forward, delivering multiple blows, primarily to R.G. but also to R.R. who hovered close by. The fight began less than a minute after passing each other.

During the melee, R.R. stabbed defendant four times, including in the chest. In the video, R.R. can be seen, as one witness described, "making movements toward" defendant, "you can't see the knife, . . . but you can presume that's when the stabbing had occurred because he's moving in close, close enough to [defendant] . . . ."

As defendant fought the Norteños, the codefendant approached, while appearing to draw a gun and rack its slide. He then pointed the gun and ran forward shooting. A witness described the codefendant as "continuously, actively shooting the victim, who was [lying] on the ground." R.G. collapsed while R.R. ran off. The codefendant and defendant then walked away. A man working nearby heard "the first guy" say something to the effect of "you didn't see nothing."

Police found defendant on a park bench a block and half away, bleeding. R.R. sustained a bullet graze wound on his left hip. R.G. died from multiple gunshot wounds. The bullet trajectory for each wound R.G. sustained was from the back of his body to the front. After the shooting, the skateboarder noticed that R.G. was wearing a red belt. The skateboarder thought the belt was gang related. Red is a Norteño color.

## Gun Evidence

Nine-millimeter shell casings found at the murder scene were fired from the same gun used to shoot T.L.

Police later found a gun in defendant's bedroom, but it was excluded as having been involved in either shooting.

## Gang Evidence

A prosecution gang expert explained that from 2014 to 2016, a gang war ensued between the Tongan Crips and the Norteños. The feud began in mid-2013 when the codefendant's brother was killed. The expert also opined that both defendant and the codefendant were Tongan Crips.

The expert testified that two years before the shooting, in early 2013, defendant was stopped in a vehicle with three validated Tongan Crips. A black ski mask was found in the car. The same year, he was in the presence of Tongan Crip members involved in a neighborhood shootout. The jury was also shown photos of clothes taken from defendant's bedroom shortly after the murder, which were described as "[a] lot of blue" and no red, and which the expert explained was consistent with Crip affiliation.

As to the codefendant, in 2014, Tongan Crip graffiti was found in his bedroom, and he told an officer he "does mess with the Tongan Crips." He was also validated as a Tongan Crip that year. After his arrest on this case, he was seen making a Crip sign in jail and came to court wearing shoes marked with gang graffiti. He has "TC" tattooed under his eye.

The expert explained that gang members take pride in their affiliation and show it by displaying colors. He also explained that in gang culture, respect is equated to fear and dominance. Within a gang, respect is earned by showing allegiance and a willingness to do things for the gang. Respect is lost by showing cowardice or unwillingness to stand up for the gang or do its work.

According to the expert, if rival gang members came across each other in a public setting, and exchanged words, neither side could back down nor walk away without losing respect. If it escalated into a fight, both sides would be compelled to fight to

maintain respect. And if one gang member is fighting, those around him would be expected to join and escalate. To do otherwise would show fear and weakness.

Further, when a gang member commits a crime involving a physical altercation, it helps establish the gang's dominance in the area—the public will be reluctant to report gang activity if it knows a gang is willing to use violence.

## Closing Arguments

During closing argument, the prosecutor argued that defendant could be convicted of second degree murder based on a theory of indirect aiding and abetting, because he committed or aided and abetted an assault, and the murder was a natural and probable consequence of the assault. The prosecutor expressly disclaimed the theory of direct aiding and abetting an intentional murder: "I don't think you're going to get there on [defendant] because you would have to assume [defendant] intended to kill [the victim] before [the codefendant] shoots." The prosecutor did not argue direct aiding and abetting implied malice murder.

The defense argued the murder was not a natural and probable consequence of a fistfight, and the shooting was precipitated by the stabbing.

## Verdicts and Sentencing

The jury found defendant not guilty of first degree murder, but guilty of second degree murder (§ 187, subd. (a)) for R.G.'s death, and found the crime was committed for the benefit, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)), as well as that defendant was a principal in an offense in which a principal personally discharged a firearm causing death (§ 12022.53, subd. (d)). It also found him guilty of two second degree robbery counts (§ 211) with firearm enhancements (§ 12022.53, subd. (b)), possessing a firearm as a felon (§ 29800, subd. (a)), and taking or driving a vehicle (Veh. Code, § 10851, subd. (a)).

The jury acquitted defendant of attempted murder of T.L. However, the codefendant was found guilty of attempted murder for that shooting.

6

The trial court imposed an aggregate 40-year-to-life indeterminate term along with an eight-year determinate term. The indeterminate term was calculated as follows: 15-years-to-life for murder, along with a 25-year-to-life term for the firearm enhancement. The aggregate determinate term was calculated as follows: the upper term of five years on count three, robbery, plus one year for the arming allegation; one year consecutive on count four, robbery, plus four months for the arming allegation (one-third the midterm on the charge and enhancement); eight months on count six, felon in possession of a firearm (one-third the midterm). Defendant was also sentenced to 364 days consecutive for the taking or driving a vehicle charge, which was satisfied with custody credits.

## DISCUSSION

### I. Substantial Evidence of Indirect Aiding and Abetting

#### A. Defendant's Contentions

Defendant contends insufficient evidence supports his conviction for murder under an aiding and abetting theory. He argues the evidence does not support a finding of direct aiding and abetting an intentional murder, as was conceded by the prosecutor. And as to indirect aiding and abetting, he maintains the record cannot show the shooting was a natural and probable consequence of starting a fistfight. He reasons that while a verbal challenge of some sort occurred, nothing indicates it had to do with gang affiliation. He emphasizes that neither he nor his codefendant wore gang colors.

The People respond that sufficient evidence supports a finding of indirect aiding and abetting based on the natural and probable consequences doctrine. The People also originally postulated on appeal that the murder conviction could also be sustained under a theory of direct aiding and abetting implied malice murder.

We first address defendant's insufficient evidence claim even though we conclude *post* that the natural and probable consequences theory has been invalidated, because if there was insufficient evidence to support the murder conviction on the theory the prosecution advanced at trial, reversal would be warranted and the issues related to

7

Senate Bill 775 would be moot.  Moreover, any retrial would be barred by double jeopardy principles.  (See *United States v. DiFrancesco* (1980) 449 U.S. 117, 131 (*DiFrancesco*) ["the Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence"]; *People v. Wetle* (2019) 43 Cal.App.5th 375, 388 (*Wetle*) [concluding that although it was necessary to reverse based on instructional error, it was also necessary to consider the defendant's insufficiency of the evidence claim to determine whether retrial is barred by double jeopardy principles].)  We conclude that sufficient evidence establishes indirect aiding and abetting and do not reach the separate theory of direct aiding and abetting implied malice murder.

### B.  Standard of Review

"In reviewing a claim for sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible, and of solid value—supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt.  [Citation.]  . . .  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence.  [Citation.]  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding."  (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639 (*Jennings*).)  In other words, " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' "  (*People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*), italics added.)

### C. Natural and Probable Consequences

Under the law in effect at the time R.G. was killed, an aider and abettor could be convicted for second degree murder committed by the direct perpetrator under two alternative theories: (1) a defendant with the necessary mental state could be liable under direct aiding and abetting principles, or (2) a defendant could be liable not only for an intended crime, but also for any offense that was the natural and probable consequences of the crime aided and abetted, i.e., indirect aiding and abetting. (*People v. Chiu* (2014) 59 Cal.4th 155, 15 (*Chiu*) 8; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117-1118.)

Thus, under "the natural and probable consequences doctrine, a person who aided and abetted only an intended assault could be found guilty of second degree murder, even if unintended, if the murder was a natural and probable consequence of the intended assault. [Citation.] Whether the nontarget crime was a natural and probable consequence was to be determined from the perspective of a reasonable person. [Citations.] 'The inquiry [did] not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability " '[was] measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' " ' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 711 (*Powell*).) Whether a consequence is reasonably foreseeable "is to be evaluated under all the factual circumstances of the individual case." (*People v. Medina* (2009) 46 Cal.4th 913, 920; *People v. Prettyman* (1996) 14 Cal.4th 248, 261). The test is " 'whether, *under all of the circumstances presented*, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901 (*Covarrubias*).) (Italics added.)

Defendant's jury was instructed that simple assault was the target crime, and substantial evidence supports a finding that the shooting was a natural and probable

9

consequence of defendant assaulting the Norteños. There was an ongoing war between Tongan Crips and Norteños. Defendant and the codefendant were Tongan Crips. R.G. and R.R. were Norteños. R.G. was wearing a red belt. As the gang expert explained, gang members commonly escalate fistfights to the point of lethal force. And fellow gang members are expected to join in the fight; otherwise, they will be considered weak.

Defendant appeared "particularly angry," and initiated the physical altercation by charging at R.G. And he did so less than a minute of passing the Norteños. When defendant charged at R.G., he knew from the preceding three hour crime spree, that his codefendant had a gun and a propensity to use it, as he demonstrated when he shot T.L.

Given these circumstances, we conclude that substantial evidence supports a finding that a reasonable person in the defendant's position would have or should have known that murder was a reasonably foreseeable consequence of the assault he initiated against rival gang members. (See *Covarrubias, supra*, 1 Cal.5th at p. 901.) Thus, the murder was a natural and probable consequence of the assault. Applying the substantial evidence test, this is certainly not a case where " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " this theory of liability.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.)

### D. Implied Malice

The People originally separately contended that defendant's murder conviction could also be sustained under a theory of implied malice murder, even though the prosecutor did not argue implied malice to the jury. While aiding and abetting implied malice murder is a valid legal theory applicable in some circumstances (see *Powell, supra*, 63 Cal.App.5th at pp. 711-714), we need not address this theory here, as we have concluded there is substantial evidence of defendant's liability for second degree murder as an indirect aider and abettor based on the formerly valid natural and probable consequences doctrine.

## II. Senate Bills 1437 & 775

In his original briefing, defendant contended he was entitled to retroactive application of the amendment to section 188, which prohibited murder convictions based on the natural and probable consequences doctrine.[5] We concluded otherwise, relying on *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*), which held that the exclusive mechanism for retroactive relief under Senate Bill 1473 was the petition procedure set forth in section 1170.95. (*Gentile*, at pp. 853-859.)

But prior to oral argument, the Legislature enacted Senate Bill 775, which added subdivision (g) to section 1170.95. Subdivision (g) provides in pertinent part: "A person convicted of murder . . . whose conviction is not final *may challenge on direct appeal the validity of that conviction* based on the changes made to Sections 188 and 189 by Senate Bill1437 [Citation]." Based on the new subdivision (g), and the prosecution's singular reliance on the natural and probable consequences doctrine in the trial court, both parties agree that defendant's murder conviction must be reversed. They disagree, however, on what happens next.

The Legislature did not expressly address this question in section 1170.95, subdivision (g). Defendant asserts that we must simply reverse his murder conviction and vacate the second degree murder sentence. The Attorney General argues that while we must reverse the conviction, we must remand the matter back to the trial court to afford the prosecution the opportunity to advance a valid murder theory at a new trial. We agree with the Attorney General.

---

[5] Section 188 was amended in Senate Bill 1437 to provide in pertinent part: "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

11

The Legislature enacted Senate Bill 775 in response to the Supreme Court's decision in *Gentile, supra*, 10 Cal.5th 830.[6] Within the statutory scheme, the new subdivision (g) addressing pending appeals follows the provisions establishing the procedures for postconviction petitions for cases that are final and the outcome for successful petitions (§ 1170.95 subds. (b)-(e)) and makes no cross-reference thereto. It thus appears, based on the text and the structure of the amended section 1170.95, and its abrogation of *Gentile*, that the Legislature enacted section 1170.95, subdivision (g) intending to allow defendants to challenge their convictions on direct appeal as an alternative to utilizing the petition procedure.[7] And because the Legislature did not expressly state the outcome for a successful direct appeal, we conclude it must have intended the usual rules applicable in similar circumstances to apply. We arrive at this conclusion based on the well-settled principle that " 'the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes " '*in the light of such decisions as have a direct bearing upon them.*' " ' " (*People v. Castillolopez* (2016) 63 Cal.4th 322, 331

---

[6] As defendant points out, an Assembly Public Safety Committee analysis states: "In *Gentile*, the California Supreme Court found that the petition process set forth in Penal Code section 1170.95 is the exclusive remedy for retroactive SB 1437 relief on nonfinal judgments. [Citation.] Generally, the rule is that a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. [Citation.] [¶] This bill would provide that where a conviction is not final, it may be challenged on SB 1437 grounds on direct appeal from that conviction." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 775 (2021-2022 Reg. Sess.) as amended July 6, 2021, p. 11.)

[7] Since section 1170.95, subdivision (g) provides that defendants "may" challenge the conviction on appeal, it does not require them to do so. Thus, we refer to subdivision (g) as an "alternative" mechanism for relief for those whose matters were pending appeal when Senate Bill 1437 was enacted. Nothing in the legislation precludes defendants who do not seek relief on appeal from seeking relief via the section 1170.95 petition procedure after the appeal is completed.

(*Castillolopez*), italics added; *People v. Licas* (2007) 41 Cal.4th 362, 367 (*Licas*); *People v. Overstreet* (1986) 42 Cal.3d 891, 897 (*Overstreet*).)

When there has been a postconviction change in the statutory or decisional law that invalidates a theory upon which the conviction was based and reversal is warranted, appellate courts remand the case to the trial court to allow the prosecution to retry the defendant on a legally valid theory. This is well-settled. In *Chiu, supra*, 59 Cal.4th 155, our high court invalidated a first degree murder conviction based on its judicial change in the law limiting the application of the natural and probable consequences doctrine to second degree murder. (*Chiu*, at p. 168.) Treating the effect of the change in the law brought about by its decision as instructional error, the *Chiu* court explained the appropriate disposition was to reverse the first degree murder conviction and allow the prosecution to retry the defendant for first degree murder under a direct aiding and abetting theory. (*Id*. at pp. 158, 168.)[8]

Similarly, in *People v. Lopez* (2021) 73 Cal.App.5th 327, retrial was allowed when Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333), which added elements to the gang enhancement, was applied retroactively to a case pending appeal. (*Lopez*, at p. 346.) The *Lopez* court held: "the gang-related enhancement findings must be vacated and the matter remanded to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22." (*Ibid.*; accord *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1033 [allowing retrial after retroactive application of Assembly Bill 333].) In addition, because the Assembly Bill 333 amendments to section 186.22 impacted the gang-related murder special

---

[8] As an alternative to retrying the greater offense, the *Chiu* court gave the prosecution the option of accepting a reduction of the conviction to second degree murder. (*Chiu, supra*, 59 Cal.4th at p. 168.)

circumstance (§ 190.2, subd. (a)(22)), the finding on that allegation was vacated and the prosecution was allowed to retry it as well. (*Lopez*, at p. 346.)

Likewise, a series of cases applied a similar disposition when reversing Vehicle Code section 10851 convictions on appeal based on the newly settled application of Proposition 47's $950 felony threshold requirement. There had been a split of authority among the court of appeal districts as to whether Proposition 47 applied to Vehicle Code section 10851 when our high court held that Proposition 47's monetary threshold applies to the theft prong of Vehicle Code section 10851 and concluded that obtaining a vehicle worth $950 or less by theft constitutes a misdemeanor. (*People v. Page* (2017) 3 Cal.5th 1175, 1187 (*Page*).) Thereafter, the court in *People v. Gutierrez* (2018) 20 Cal.App.5th 847 (*Gutierrez*), reversed a Vehicle Code section 10851 conviction then pending appeal based on the newly settled rule of law in *Page*, and held that because the jury had not been instructed that the monetary threshold was an element, the jury had been instructed on a legally invalid theory. (*Gutierrez*, at p. 857.) Following our high court's lead in *Chiu*, the *Gutierrez* court reversed the felony conviction and remanded the matter to allow the prosecution to retry the matter under a valid theory with the appropriate instructions. (*Ibid*.)[9]

The court in *Gutierrez* remanded for the possibility of retrial even though the defendant had been prosecuted after Proposition 47 was enacted. It did so because the law as to the application of the $950 requirement to Vehicle Code section 10851 theories had not been settled until our high court's decision in *Page*. The *Guiterrez* court reasoned: "[W]e decline to fault either the trial court or the prosecutor for failing to correctly anticipate the outcome of cases pending before the Supreme Court. *This is not*

---

[9] As an alternative to retrying the defendant on a felony, the *Gutierrez* court gave the prosecution the option of accepting a reduction of the conviction to a misdemeanor. (*Gutierrez, supra*, 20 Cal.App.5th at p. 857.)

*an instance where either the court or the prosecutor misinterpreted or failed to follow established law*." (*Gutierrez*, *supra*, 20 Cal.App.5th at p. 858, italics added.) Accordingly, the court held: "Following the guidance of *Chiu*, the appropriate remedy for the error here is to allow a retrial on the felony charge if the People can *in good faith* bring such a case." (*Ibid*., italics added.) Other courts have followed the *Gutierrez* court's lead allowing retrials after Vehicle Code section 10851 conviction reversals based on the decision in *Page*. (See *People v. Martel* (2019) 42 Cal.App.5th 225, 238 (*Martel*) and cases cited therein [agreeing with sister courts "that the appropriate remedy is to allow a retrial on the felony charge if the People can in good faith bring such a case"].)[10]

We presume that the Legislature was aware of the decisional law having a bearing on Senate Bill 775. (*Castillolopez, supra*, 63 Cal.4th 322, 331.) Thus, given that the

---

[10] Allowing for a new trial after a postconviction change in the law during a pending appeal is not new. For example, in *People v. Balderas* (1985) 41 Cal.3d 144 at pages 1978-199, and *People v. Garcia* (1984) 36 Cal.3d 539 at pages 557-558, our high court provided the same disposition in the context of its application of the judicially established rule in *Carlos v. Superior Court* (1983) 35 Cal.3d 131. In *Carlos*, the court had held that an actual killer had to act with intent to kill to be liable for a felony-murder special circumstance under the former statute. (*Carlos*, at pp. 152-154.) Because *Carlos* was decided while the appeals in *Balderas* and *Garcia* were pending, the court remanded those cases to the trial court to allow a new trial in which the prosecution was permitted to prove intent to kill. (See *Balderas*, at p. 199, fn. 25 ["Now that both parties are aware of the importance of the intent issue, both *must have the opportunity to introduce all evidence at their command on that issue,*" italics added]; *Garcia*, at pp. 557-558 [Rejecting defendant's argument that the prosecution should be barred from retrial because it did not present sufficient evidence at the original trial to establish intent to kill in connection with its deliberation and premeditation theory of first degree murder; "We agree with the defendant that the evidence presented may be insufficient to support a finding of intent to kill, but think it *unrealistic to assume that the prosecution, with a perfect case for proof of felony murder, necessarily presented all available evidence relating to intent.* We therefore reverse the special circumstance finding without directions, permitting the prosecution to seek retrial of that issue," italics added.)

15

availability of retrial based on a retroactive change in the law appears to have been well-settled when the Legislature enacted section 1170.95, subdivision (g), permitting a "challenge on direct appeal" to "the validity of [a murder] conviction" based on Senate Bill 1437's amendments, we conclude the Legislature must not have foreclosed the possibility of retrial in this context.  (See *Castillolopez*, at p. 331; *Licas, supra*, 41 Cal.4th at p. 367; *Overstreet, supra*, 42 Cal.3d at p. 897.)

Defendant, however, argues that as a matter of statutory construction, the Legislature intended to allow challenges for insufficiency of the evidence in allowing defendants to "challenge on direct appeal the validity" of their murder conviction under the Senate Bill 1437 amendments.  He further argues we must determine the sufficiency of the evidence to support a conviction under section 188 as amended, that determination must be based on the evidence presented at the original trial, and if insufficient evidence supporting a legally valid theory was introduced, retrial is inappropriate.  But defendant does not point to anything in the statute or Legislative history that supports this interpretation.   Indeed, defendant points to nothing in the text of the amended section 1170.95 or the legislative history of Senate Bill 775 that suggests the Legislature intended to treat defendants whose convictions were pending appeal drastically different than defendants whose cases were final.  Moreover, our review of the available legislative history has uncovered no such intent.

And to be sure, prohibiting retrial because there was insufficient evidence at the original trial to support the remaining valid theory would yield drastically different treatment.  For defendants whose cases are final, they must seek relief via the petition procedure set forth in section 1170.95, subdivisions (b)-(f).  That procedure allows for an evidentiary showing to a court as to a valid theory and the introduction of new evidence

16

to support that showing.[11]  That is similar to the application of *Chiu*, where, in cases reversed on appeal, the prosecution is permitted to retry defendants before a jury on legally valid theories of first degree murder.  In such a proceeding, additional evidence on legally valid theories can be introduced.  (See fn. 10, *ante*.)

Prohibiting retrial, by contrast, would bestow a bounty to defendants with pending appeals, vacating the sentence without further evidentiary proceedings on a valid theory. As our high court in *Gentile* noted concerning the feature of the section 1170.95 petition procedure in which the introduction of new evidence is permitted, the Legislature "allowed for the possibility that some convictions that implicate the ameliorative provisions of Senate Bill 1437 may nonetheless remain valid." (*Gentile, supra*, 10 Cal.5th at p. 854.)  We see nothing in the text or the history of Senate Bill 775 repudiating this observation by the *Gentile* court or otherwise indicating the Legislature intended a drastically different result for defendants with pending appeals by vacating their sentences without an evidentiary proceeding on valid theories of culpability.

Defendant also asserts that retrial is inappropriate based on due process and double jeopardy principles.  He fails, however, to explain why the *Chiu* court and its progeny or any other cases allowing for the possibility of retrial, did not see due process or double jeopardy as impediments to retrial.  We think the reason for his failure to do so is clear: these constitutional principles do not operate to bar retrial in the context of changes in the law invalidating a prosecutorial theory or otherwise changing the prosecution's proof requirements after a conviction has been obtained.

---

[11]  Subdivision (d)(3) provides that "[a]t the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019" and "[t]he prosecutor and the petitioner *may also offer new or additional evidence to meet their respective burdens*." (Italics added.)

Defendant cites *People v. Superior Court* (*Marks*) 1 Cal.4th 56 at page 72, arguing that because "[t]he ground of the conviction has been removed by legislative amendment . . . [h]e cannot be tried again." But nothing in *Marks* states such a rule or even suggests as much. *Marks* merely repeats the well-settled principle from *United States v. DiFrancesco* (1980) 449 U.S. 117, that double jeopardy bars retrial when a conviction is reversed for insufficient evidence. (*Marks*, at p. 72, quoting *DiFrancesco*, at p. 131.)[12] The high court in *DiFrancesco* court made clear that reversal for insufficient evidence is the "one exception" to the general rule that, "if a trial has ended in a conviction, the double jeopardy guarantee 'imposes no limitations whatever upon the power to retry a defendant who has succeeded in getting his first conviction set aside….' " (*DiFrancesco*, at p. 131; see also *Tibbs v. Florida* (1982) 457 U.S. 31, 40 (*Tibbs*) [characterizing insufficient evidence as a "*narrow exception* from the understanding that a defendant who successfully appeals a conviction is subject to retrial," italics added].) The *DiFrancesco* court explained: "[T]o require a criminal defendant to stand trial again after he has successfully invoked a statutory right of appeal to upset his first conviction is not an act of governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect." (*DiFrancesco*, at p. 131.)

As our high court has recognized, there is a distinction between trial error and insufficient evidence. "*Unlike a reversal for trial error*, which 'does not constitute a decision to the effect that the government has failed to prove its case' [citation], a

---

[12] In *Marks*, the double jeopardy issue our high court decided was "whether a conviction of a lesser degree crime by operation of law [under section 1157] should be accorded the same effect on retrial as an express finding of the lesser degree crime by the previous trier of fact" or whether retrial on a greater degree crime was permissible. (*Marks, supra*, 1 Cal.4th at p. 62.) The court concluded that section 1157 should have the same effect and barred retrial on the greater degree crime. (*Marks*, at pp. 62, 71-78.) *Marks* had nothing to do with postconviction legislative amendments changing the law during an appeal.

reversal based on evidentiary insufficiency 'means that the government's case was so lacking that it should not have even been submitted to the jury. . . .' 'A reversal based on the insufficiency of the evidence has the same effect [as a judgment of acquittal] because it means that no rational factfinder could have voted to convict the defendant.' " (*People v. Seel* (2004) 34 Cal.4th 535, 544 (italics added), quoting *Burks v. United States* (1978) 437 U.S. 1 at pp. 15, 16 and *Tibbs, supra*, 457 U.S. at p. 41.)

A postconviction change in the law invalidating a prosecution theory is the equivalent of a trial error because it means the jury was instructed on a legally invalid theory. (See *Chiu, supra*, 59 Cal.4th at p. 158 [characterizing the error as instructional error]; *Gutierrez, supra*, 20 Cal.App.5th at p. 857 [same, noting that the court's instructions allowed the prosecution to convict defendant on a "legally incorrect theory"].) Moreover, as our high court has explained, the insufficient evidence rule barring retrial is "inapplicable" in a situation where the reversal is based on a postconviction change in the law: "The [insufficient evidence] rule achieves its aim— i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. [Citation.] But the incentive serves no purpose when . . . *the prosecution did make such a case under the law as it then stood*; *having done so, the prosecution had little or no reason to produce other evidence of guilt*." (*People v. Shirley* (1982) 31 Cal.3d 18, 71 (*Shirley*),[13] italics added; see also *In re*

_____

[13] In *Shirley, supra*, 31 Cal.3d 18, our high court reversed a sexual assault conviction after judicially disapproving of testimony that resulted from hypnosis. The trial court had allowed the testimony based on the then-prevailing general rule that the fact of victim's pretrial hypnosis went to " 'the weight, not the admissibility' " of her testimony. (*Shirley*, at pp. 70-71.) During the trial, the victim had testified to matters she had been unable to recall during police interviews and her preliminary hearing testimony and further testified that before being hypnotized, she recalled the events only " 'vaguely' " and that the hypnosis helped her fill in gaps in her memory. (*Id*. at p. 30.) Rejecting the defendant's double jeopardy claim, the *Shirley* court held the prosecution could retry

19

*D.N.* (2018) 19 Cal.App.5th 898, 902 (*D.N.*) ["[w]here the prosecution *makes its case under the law as it stood at trial*, double jeopardy is not implicated as it would otherwise be where there is evidentiary insufficiency," italics added].)

The prosecution was not required to establish direct aiding and abetting of either express or implied malice murder to obtain the second degree murder conviction, and thus it had "no reason to produce other evidence of guilt" to support these theories. (See *Shirley, supra*, 31 Cal.3d at p. 71.) The evidence it presented was sufficient to support the conviction based on the then legally valid natural and probable consequences doctrine. And as we observed in *Powell*, the prosecution had often relied solely on the natural and probable consequences doctrine to prove aider and abettor liability. (*Powell, supra*, 63 Cal.App.5th at p. 711, fn. 26.) In many cases, that theory may have been easier to prove, even if direct aiding and abetting theories would have established guilt. And in some cases, the prosecution may have foregone calling witnesses to establish direct aiding and abetting, knowing that liability could be established based on the natural and probable consequences theory. Whatever the reason for not introducing evidence to support other available theories, the law did not require it, and the prosecution here made its case under the law as it stood at trial. (*Shirley*, at p. 71; *D.N., supra*, 19 Cal.App.5th at p. 902; see also, fn. 9, *ante*.) This is not a situation where the prosecution misinterpreted or failed to follow established law. (*Gutierrez, supra*, 20 Cal.App.5th at p. 858.) And, like the court in *Gutierrez*, we decline to fault the prosecution for failing to anticipate the change in the law. (*Ibid*.)

We shall follow our high court's lead in *Chiu* and conclude that when there is a change in the law during an appeal that invalidates a previously valid legal theory relied

_____

defendant with the victim's preliminary hearing testimony because it reflected events that were not the subject of her hypnotic experience. (*Id*. at pp. 71-72.) The court concluded: "Whether a retrial is justified in the circumstances of this case is for the prosecutor to determine." (*Id*. at p. 72.)

20

upon by prosecution and reversal is thereby warranted, a new trial should be permitted on legally valid theories.[14] Further, we conclude that there is no due process or double jeopardy impediment to retrial under these circumstances.[15] Accordingly, while defendant is entitled to have his second degree murder conviction reversed in this appeal based on the enactment of section 1170.95, subdivision (g) in Senate Bill 775, the prosecution is entitled to retry him on that charge if it can *in good faith* advance a valid legal theory to support the conviction. (See *Gutierrez, supra*, 20 Cal.App.5th at p. 858.)

### III.  The Failure to Object to Certain Gang Testimony

### A.  Defendant's Contentions

Defendant contends his trial counsel rendered ineffective assistance in failing to object to the gang expert's opinion testimony that the shooting was gang-related "on both sides." He argues this was an impermissible opinion regarding defendant's specific intent when committing a crime. We disagree.

### B.  Additional Background

Defendant's contention focuses on an isolated portion of testimony italicized below. We recount that portion as well as the necessary context.

---

[14] Reversal would not be warranted where the error is harmless beyond a reasonable doubt. (See *People v. Aledamat* (2019) 8 Cal.5th 1, 3.) Here, the Attorney General impliedly acknowledges the error was not harmless, conceding that "based on the prosecutor's argument to the jury, it is apparent that [defendant's] murder conviction was based *solely* on the natural and probable consequences theory" and thus, defendant is entitled to reversal of the second degree murder conviction. (Italics added.)

[15] While defendant asserts a due process violation, he advances no constitutional theory separate from double jeopardy principles. Moreover, it is not lost on us that the People also have a right to due process. California Constitution, Article 1, section 29 provides in pertinent part: "In a criminal case, the people of the State of California have the right to due process of law." (Cf., *Marks, supra*, 1 Cal.4th at p. 77 [noting that "the People's right to due process is accordingly not offended" by the application of double jeopardy principles in that case].)

21

During direct examination of the gang expert, the prosecutor asked a series of hypothetical questions mirroring the facts of this case.

"[Prosecutor]: I'm going to give you a little bit of a hypothetical situation. [¶] If members of gangs that were actively rivals were to come across each other in a public setting, no matter what the public setting is, and were to exchange words of some sort, would either side of that verbal altercation be able to back down or walk away without losing respect?

"[Gang Expert]: No . . . you would definitely lose face. You would lose respect amongst your peers or your fellow gang members if you're not willing to stand up and, I guess, defend the honor of your gang, per se.

"[Prosecutor]: And what if those verbal words, the altercation, escalated into a fight? Would both sides be compelled to fight in order to maintain respect?

"[Gang Expert]: Yes, generally, absolutely.

"[Prosecutor]: So more specifically, if you had two guys on each side and one guy from side A charges in to fight one guy from side B, would the other guys that were there be compelled to fight, or would it be a standard one-on-one fight typically?

"[Gang Expert]: I would say typically, it's going to be a—there's going to be a natural progression involved in these altercations. It's not common to have just two— you know, with two groups or several subjects, to just fairly, you know, duke it out, throw blows, and then be all good and go about your way. [¶] There will be an escalation, generally, and I think it would be—it's expected that those around there are going to join in and, you know, I guess help advance that escalation.

"[Prosecutor]: Now, I'm going to push it a little bit further. If the guy from side A who rushes in to fight the guy from side B—if the second guy from side B gets into that fight, what would the expected reaction of the second guy from side A be?

"[Gang Expert]: To join in and to do whatever it takes to help his partner or to . . . basically come out victorious. They need to win that fight, that altercation.

22

"[Prosecutor]: And if the second guy from side A, if he never gets involved in the physical fight, is the other gang going to think that he's weak or afraid?

"[Gang Expert]: I would say not only the other gang, but probably his own gang as well."

Later during the prosecution's direct examination, after the expert opined that defendant and the codefendant were Tongan Crip gang members, the following occurred:

"[Prosecutor]: Okay. Now, let's talk about this case. Are you familiar with the facts of this case?

"[Gang Expert]: Yes.

"[Prosecutor]: And how did you familiarize yourself with this case?

"[Gang Expert]: Mostly by discussing it with other detectives as well as reading the reports and just doing some of the research . . . .

"[Prosecutor]: *And is it your opinion that the Sacramento City College portion of September 3, 2015, is a gang-related crime?*

"[Gang Expert]: *I believe it is, yes.*

"[Prosecutor]: *Would it be your opinion that it's a gang-related crime on both sides, meaning [R.R.'s] prosecution for assault with a firearm [sic], as well as the shooting and homicide of [R.G.]?*

"[Gang Expert]: *Yes*

"[Prosecutor]: Why?

"[Gang Expert]: Well, you have two separate groups, you know, two people in each both being gang members, as well as an ongoing feud that has been going on for a couple years, and then just by the actions of both groups would be consistent with what happens when two rival gangs encounter each other.

"[Prosecutor]: And how would this kind of a situation itself specifically benefit either or both gangs: Two guys on each side coming across each other on a college

23

campus, brief exchange of words, a fight escalates to a stabbing and a shooting. How does that benefit either or both gangs?

"[Gang Expert]: It would definitely—you don't want to be the loser in that sense. That would show the weakness. By being the one who showed dominance, who showed the willingness to commit the violence, you're establishing that sense of respect that we discussed earlier, where other gangs are going to fear you, respect you. It gives you a better standing out and about in your area.

"[Prosecutor]: If you lose a simple fist fight, in gang culture, are you a punk? Do you lose respect?

"[Gang Expert]: Yes.

"[Prosecutor]: And if you get stabbed, in gang culture, and you don't respond, are you a punk? Do you lose respect?

"[Gang Expert]: Yeah. You're going to look weak.

"[Prosecutor]: If you get stabbed but end up shooting and killing somebody, who's the loser of that event, in gang culture?

"[Gang Expert]: The loser in that in gang culture is going to be the one . . . who got shot or killed."

Defense counsel did not object to any part of this testimony, including the italicized portion, which defendant challenges on appeal. According to defendant, his counsel rendered ineffective assistance in failing to do so. He argues the expert was not testifying to a hypothetical but to the intentions of the defendants. We conclude defendant has failed to establish ineffective assistance of counsel.

### C. Analysis

To prevail on a claim premised on the ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-694

24

[80 L.Ed.2d 674, 693, 696-698] (*Strickland)*; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland's* high bar is never . . . easy.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 632], quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 357 [176 L.Ed.2d 284, 297].) *Strickland's* bar is high because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.]" (*Richter, supra*, 562 U.S. at p. 105.)

The first prong, concerning deficient performance, involves two issues in the context of this case: (1) Whether the testimony was objectionable and (2) if it was objectionable, was the decision not to object tactical.

Citing *People v. Vang* (2011) 52 Cal.4th 1038, 1044, defendant argues that gang experts are prohibited from opining on a defendant's specific intent.[16] But that is not

---

[16] Defendant also cites *People v. Killebrew* (2002) 103 Cal.App.4th 644, disapproved in *Vang, supra*, 52 Cal.4th at p. 1047, fn. 3. Regarding *Killebrew* and its prohibition against gang expert testimony as to a defendant's specific intent, the *Vang* court stated: "To the extent that *Killebrew* [citation] was correct in prohibiting expert testimony regarding whether the specific defendants acted for a gang reason, the reason for this rule is *not* that such testimony might embrace the ultimate issue in the case. 'Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact.' [Citations.] Rather, the reason for the rule is similar to the reason expert testimony regarding the defendant's guilt in general is improper. 'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." ' " (*Vang, supra*, 52 Cal.4th at p. 1047.) But the *Vang* court also noted: "*It appears that in some circumstances, expert testimony regarding the specific defendants might be proper.* [Citations.] The question is not before us. Because the expert here did not testify directly about the defendants, but

25

what happened here; the expert did not opine as to anyone's specific intent. He opined that the crime was gang related, something the *Vang* court recognized gang experts are allowed to do. (*Vang*, at p. 1045, discussing *People v. Gardeley* (1996) 14 Cal.4th 605, 619.)

Still, such opinions are usually preceded by a hypothetical question mirroring the evidence in the case, as approved in *Vang*. (*Vang, supra*, 52 Cal.4th at pp. 1045-1046; see also *People v. Perez* (2017) 18 Cal.App.5th 598, 607 ["[w]hile a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury whether the alleged crime was committed to benefit a gang and whether the hypothetical perpetrator harbored the requisite specific intent"].) In discussing such hypothetical questions, the *Vang* court emphasized that " 'the expert's opinion may not be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors," ' " but rather "must be rooted in the evidence of the case being tried." (*Vang*, at p. 1046.)

Along those lines, defendant argues, in his reply brief, that the gang expert's opinion here was not solicited as a hypothetical question. He acknowledges the gang expert "could have offered an opinion based on a hypothetical," citing *Vang*; but maintains "any hypothetical based on the evidence would not have supported the detective's conclusion."

But as noted, *Vang* authorizes opinions that a crime is gang related. (*Vang, supra*, 52 Cal.4th at p. 1045.) Regarding the gang expert, the *Vang* court wrote: "[H]e could not testify directly whether [the defendants] committed the assault for gang purposes. But he properly could, and did, express an opinion, based on hypothetical questions that

---

only responded to hypothetical questions, we will assume for present purposes the expert could not properly have testified about the defendants themselves." (Italics added.) (*Vang*, at p. 1048, fn. 4.)

tracked the evidence, whether the assault, if the jury found it in fact occurred, would have been for a gang purpose." (*Id*. at p. 1048.)

Here, the expert did not directly testify that defendant committed the murder for a gang purpose. More importantly, the answer the expert gave clearly established his opinion was grounded on evidence the jury had heard, which is the point of soliciting the opinion by a hypothetical question. And that evidence was sufficient to support his opinion. When asked why he was of the opinion the crimes committed at the college were gang related, the detective replied: "Well, you have two separate groups, you know, two people in each both being gang members, as well as an ongoing feud that has been going on for a couple years, and then just by the actions of both groups would be consistent with what happens when two rival gangs encounter each other."

Those facts could have been posed in the form of a hypothetical, and then the expert would have been permitted to opine that the crime was gang related based on those hypothetical facts. But, in our view, an expert explaining his reason by referencing specific facts in the case is consistent with *Vang's* direction that an expert's opinion be grounded on evidence the jury heard and not "on speculative or conjectural factors." (*Vang, supra*, 52 Cal.4th at p. 1046.) Moreover, as the totality of the questions and answers we have cited demonstrates, the prosecutor had asked hypothetical questions mirroring the facts of the case earlier in the direct examination. We see no reason why the prosecutor would need to repeat the same hypothetical questions before soliciting an opinion as to whether the crime was gang related, especially when the reason the expert gives for the opinion is rooted in the evidence of the case. Trial counsel could have been thinking the same thing, and so, no objection was made.

That brings us to the second question in determining whether trial counsel's performance was deficient: Was there a tactical reason for not objecting? As our high court has noted: "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only

if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) *there simply could be no satisfactory explanation.*" (*People v. Mai* (2013) 57 Cal.4th 986, 1009, italics added and omitted.)

Here, a satisfactory explanation exists for not objecting. The opinion as to whether the murder was gang related was admissible, so it was coming in anyway. Making the prosecutor ask another hypothetical question would have served only to reemphasize the evidence establishing the opinion's validity. It is understandable why defense counsel did not object.

The same holds true with the prejudice prong: any objection based on the lack of a hypothetical question, if sustained, would not have prohibited the opinion if asked pursuant to a proper hypothetical question. Thus, assuming another hypothetical question was required, the opinion would still have come in once posed. Defendant therefore has not established that he was prejudiced from the failure to object, and the claim of ineffective assistance is accordingly meritless. (*Strickland, supra*, 466 U.S. at pp. 693-694 [To establish prejudice, a defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient]; *Ledesma, supra*, 43 Cal.3d 171, at pp. 217-218.)

## IV.  Sufficiency of Evidence Regarding the Gang Enhancement

### A.  Defendant's Contentions

Defendant next contends insufficient evidence supports the finding that he acted to benefit, or in association with, a criminal gang. He argues there was a lack of evidence that he was a gang member and none of the crimes preceding the murder indicated gang motivation or carried gang enhancements. Further, according to defendant, the expert opinion that the shooting was gang motivated was based on speculation as to what was said between defendant and the Norteños just before the physical altercation. He also notes that neither he nor the codefendant wore gang colors, and neither group knew each

28

other. He suggests that the evidence is such that he simply reacted to an insult or challenge, unrelated to a gang.

Having concluded defendant is entitled to a new trial on the second degree murder conviction, we must vacate the associated gang enhancement. We, nevertheless, address this insufficient evidence contention because if the evidence introduced at his first trial was insufficient based on the then existing law, retrial on the enhancement would be barred by double jeopardy principles. (See *DiFrancesco, supra*, 449 U.S. at p. 131; *Wetle, supra*, 43 Cal.App.5th at p. 388.) We conclude substantial evidence supports the gang enhancement finding and defendant may be retried on the enhancement.[17]

## B. Standard of Review

Again, when the sufficiency of the evidence is challenged on appeal, we look at the record in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence. (*Jennings, supra*, 50 Cal.4th at pp. 638-639.) Reversal is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*Ibid*.)

## C. Analysis

To establish a gang enhancement under section 186.22, subdivision (b)(1), the defendant need not be an active or current gang member. (*People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 539.) "Gang membership is simply circumstantial evidence" that the crime was gang related and shows a motive for harboring intent " 'to promote, further, or assist in any criminal conduct by gang members.' " (*Id*. at p. 540.)

Here, again, a gang expert opined that defendant was a member of the Tongan Crips, as was his codefendant. Apart from the expert's opinion, the other evidence at the

---

[17] We offer no opinion about whether the evidence would be sufficient under the amendments in Assembly Bill 333 and leave it to the parties to litigate that matter on remand.

29

very least, established that defendant closely associated with the Tongan Crips and his crimes were motivated by that association. He was twice found with Tongan Crips. His clothing was consistent with Crip affiliation. And before the murder, he spent three hours on a crime spree with a Tongan Crip. Together, this forms strong circumstantial evidence of Tongan Crip affiliation and concomitantly intent to benefit a gang and its members by attacking the gang's enemies, the Norteños. Clearly, defendant's conduct and that of the codefendant was consistent with a confrontation between warring gangs. And though defendant asserts neither group knew each other, the gang expert testimony suggests lack of personal familiarity does not stop gang members from assaulting one another. Indeed, the fact that the groups came to blows in less than a minute of passing each other strongly suggests the most logical explanation for the confrontation was gang motivation.

Accordingly, a jury could reasonably conclude defendant acted to benefit, or in association with, a criminal street gang. Again, this is certainly not a case where " ' " 'upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the gang enhancement finding.' " (*Penunuri, supra*, 5 Cal.5th at p. 142, italics added.) The contention therefore lacks merit, and defendant may be retried on the gang enhancement.

### V.  Self-Defense and Mutual Combat Instructions

Defendant next contends the trial court erred in failing to instruct that defendant could not be convicted of murder if he reasonably believed his codefendant would—as a natural and probable consequence of defendant being stabbed—act in defense of another. Defendant raises an identical instructional challenge as to the instruction on self-defense and mutual combat.

We addressed and rejected these contentions in our original opinion. Given our reversal of defendant's second degree murder conviction grounded on the formally valid natural and probable consequences doctrine, these contentions are moot, and we need not address them again.

## VI.  Conduct Credits

In his final contention, defendant argued the trial court erred in subtracting 96 days of conduct credits for jail violations, leaving him with only 24 days conduct credit.  He also argued he should have received an additional 182 days of conduct credit attributable to his misdemeanor conviction.

The People took issue with defendant's calculation and also pointed out that by virtue of his murder conviction, defendant was ineligible for any conduct credit.  The People were correct.  (See § 2933.2, subd. (a) ["any person who is convicted of murder, as defined in Section 187, shall not accrue any credit, as specified in Section 2933 or Section 2933.05"]; *People v. Wheeler* (2003) 105 Cal.App.4th 1423, 1432 ["section 2933.2 applies to the offender not to the offense and so limits a murderer's conduct credits irrespective of whether or not all his or her offenses were murder"].)

However, because we are reversing defendant's second degree murder conviction, defendant must be resentenced whether or not there is a new trial and conviction.  Defendant's credits claim is therefore moot.  The trial court will need to recalculate defendant's credits when it resentences him.

**DISPOSITION**

The second degree murder conviction is reversed and the associated enhancements are vacated. The matter is remanded to the trial court for a new trial on the second degree murder charge and associated enhancements if the prosecution can in good faith advance a valid theory of culpability for second degree murder. In all other respects the judgment is affirmed.

/s/
MURRAY, J.*

We concur:

/s/
RAYE, P. J.

/s/
RENNER, J.

---

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.